# Supreme Court of Texas

No. 23-0384

American Midstream (Alabama Intrastate), LLC,

*Petitioner*,

v.

Rainbow Energy Marketing Corporation,

*Respondent*

On Petition for Review from the
Court of Appeals for the First District of Texas

**Argued January 13, 2025**

JUSTICE SULLIVAN delivered the opinion of the Court.

Justice Devine did not participate in the decision.

"We have long held that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained." *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) (Abbott, J.). The courts below impermissibly blue-penciled extra words into Section 9.1 of the MAG-0005, which is the contract that gave rise to this dispute between American Midstream (Alabama Intrastate), LLC ("AMID") and Rainbow

Energy Marketing Corporation. We reverse, render judgment in part for AMID, and remand for a new trial on Rainbow's and AMID's breach-of-contract claims.

**I**

This case involves the flow of natural gas across two interconnected pipelines, the Transco and the Magnolia. Rainbow, a gas-trading company, had contracts to transport natural gas through both pipelines. The MAG-0005 was Rainbow's contract with AMID, which owns the Magnolia. To understand the MAG-0005, it helps to know how it came to be.

AMID and Rainbow executed their first agreement, the MAG-0001, in 2014. The MAG-0001 allowed Rainbow to transport up to 25,000 MMBtu of gas daily through the Magnolia. To transport gas, Rainbow electronically nominated (or scheduled) with AMID an equal amount of gas to enter and exit the Magnolia. AMID would schedule a corresponding amount of gas to flow into the connected Transco pipeline on Rainbow's behalf. Rainbow could then withdraw gas from the Transco and sell it to a downstream customer.

The MAG-0001 required Rainbow to maintain a balanced flow of gas across the Magnolia. That is, Rainbow needed to put into the Magnolia an amount of gas equal to what it withdrew from the Magnolia. Further, the MAG-0001 was "firm," requiring AMID to accept Rainbow's gas nominations unless the MAG-0001 itself said otherwise. "Interruptible" agreements, by contrast, allow a pipeline to refuse a shipper's nomination for any reason.

When AMID scheduled gas to flow into the Transco, but a different amount of gas physically flowed across the interconnect, a so-called "single-point imbalance" would occur at the Magnolia–Transco interconnect. Under the Operational Balancing Agreement between AMID and Transco, AMID was allowed to maintain a daily single-point imbalance at the Magnolia–Transco interconnect. Any gas AMID scheduled to be delivered into the Transco was "deemed . . . received" by Transco that day, even if the gas was not physically delivered. Transco could require AMID to limit its single-point imbalance if an imbalance "exceed[ed] 5% of confirmed nominations" at the interconnect and "create[d] operational concerns in either [p]arty's sole discretion."

Rainbow learned that, under the Operational Balancing Agreement, AMID maintained daily single-point imbalances as large as 40,000 MMBtu. Seeking to leverage AMID's balancing flexibility at the interconnect, Rainbow approached AMID about executing their own balancing agreement. And so the MAG-0005 was born.

In February 2015, Rainbow and AMID executed the MAG-0005, which they labeled a "Firm Gas Transportation Agreement." Similar to the MAG-0001, the MAG-0005 allowed Rainbow to physically transport up to 20,000 MMBtu of gas daily through the Magnolia. Rainbow paid a "demand rate" for the ability to transport 20,000 MMBtu daily, regardless of whether it used the service on any given day.

But Rainbow never used the MAG-0005 to transport gas. Rather, the parties designed the MAG-0005 to provide balancing services, and that is how Rainbow used it. Section 9.1 of the MAG-0005 required

3

AMID to provide Rainbow with balancing services—unless, of course, the contract itself said otherwise.  And that brings us to Section 9.1:

> Receipts and Deliveries of Gas.  Except as otherwise provided for herein, for the purposes of Section 8 of the SOC, Shipper shall not be obligated to balance receipts and deliveries of gas on a daily basis unless, on or for any Day, either Transporter or Shipper is requested or required by an upstream or downstream party to balance receipts and deliveries of gas attributable to Shipper.  If Transporter is requested or required by an upstream or downstream party to balance receipts or deliveries of gas that are attributable to Shipper, Transporter may cease receiving gas from or delivering gas to or for Shipper until the upstream or downstream party no longer requests or requires Transporter to balance receipts and deliveries of Shipper's gas.

Within this key provision, Rainbow is the "Shipper," and AMID is the "Transporter."  Transco, meanwhile, is "an upstream or downstream party."

To use the MAG-0005's balancing services, Rainbow would submit an imbalanced nomination of gas.  For example, Rainbow could schedule 0 MMBtu of gas to enter the Magnolia and 20,000 MMBtu of gas to exit the Magnolia.  Rainbow's use of the balancing services resulted in a "point-to-point imbalance"—an unequal flow of gas across the Magnolia.

Importantly, Rainbow's contractual right to run an imbalance meant it could withdraw gas from the Magnolia without simultaneously supplying the Magnolia with an equal amount of gas.  Section 9.2 required Rainbow to resupply the Magnolia and be in balance by the end of each month.  Rainbow believed the MAG-0005 would be "very profitable" because it allowed Rainbow to withdraw gas from the

4

Magnolia to sell downstream when gas prices spiked; and then, up to a month later, to resupply the Magnolia when gas prices fell. Buy low and sell high, as the saying goes.

Section 9.1 excused AMID from providing balancing services to Rainbow in two scenarios. Under the first sentence of Section 9.1, Transco could require AMID or Rainbow to limit point-to-point imbalances that were attributable to Rainbow. And under the second sentence of Section 9.1, Transco could require AMID to limit single-point imbalances at the Magnolia–Transco interconnect that were attributable to Rainbow. Only AMID's ability to limit point-to-point imbalances under sentence one is at issue.

Pipelines must limit physical imbalances because if there is too much or too little gas in a pipeline, it may rupture or stop flowing. *Cf.* THE KARATE KID (Columbia Pictures 1984) ("Better learn balance. Balance is key."). Transco could require AMID or Rainbow to limit imbalances by issuing an Operational Flow Order. Through such an OFO, Transco "provided notice of limited flexibility to manage imbalances and recommended shippers maintain a concurrent balance of receipts and deliveries."

It is undisputed that no OFO required AMID to limit single-point imbalances under the Operational Balancing Agreement. Thus, sentence two of Section 9.1 never excused AMID's performance. But Transco's OFOs could also direct shippers, like Rainbow, to limit imbalances—triggering AMID's sentence-one exemption. For each relevant OFO, the box for "[a]ffected [s]hipper(s)" was blank, followed by the notation that "[i]f specific [shippers] have been identified, only

5

imbalances created by those shippers/[Operational Balancing Agreement] parties will be subject to the OFO provisions." The parties dispute whether the OFOs applied to Rainbow such that sentence one of Section 9.1 excused AMID's performance.

The parties operated smoothly under the MAG-0005 for almost a year until Transco started limiting imbalances more strictly. In early January 2016, AMID told Rainbow that due to a Transco OFO, it could not provide the full 20,000 MMBtu of balancing services. Forty-five minutes later, AMID told Rainbow that "[t]he OFO doesn[']t really affect us now as [Transco] ha[s] not pulled in the [Operational Balancing Agreement] parties." On various days throughout 2016, AMID "advise[d] Rainbow to limit its out-of-balance nominations," and on at least one day, AMID curtailed Rainbow's nomination. On many of these days, an OFO was in place.

In December 2016, representatives from AMID and Rainbow held a conference call to discuss the functioning of the MAG-0005 under Transco's stricter stance on limiting imbalances. Rainbow trader Tim Moreino began the call, stating:

> I know when we first got into our balancing agreement, that these OFO[]s were, historically, not called in [the Magnolia's region]. So, now they've been calling them . . . . I just kind of want to hear from you guys what you think that looks like going forward in the future on our flexibility on using this balancing agreement.

Patricia De La Rosa, AMID's senior gas scheduler, stated that, given Transco's new practice of issuing OFOs more frequently, AMID wanted to "keep [its] imbalance under the radar with Transco, as much as possible." She went on to state:

6

[B]eing able to swing [20,000 MMBtu] for consecutive days, that's not going to happen. Because [Transco will] call us out very quickly the next day or two and tell us to get on rate. . . . We just want to make sure that you guys understand that [the MAG-0005] is interruptible, subject to the approval or being under [the] radar with Transco.

The parties then agreed to "huddle up and try to figure it out." Moreino stated that Rainbow loved "the flexibility [of the MAG-0005] . . . . [I]t just seems [like] the pipe is changing[,] . . . and we just want to figure [it] out."

The parties continued operating under the MAG-0005 for over a month after the conference call. During this time, AMID told Rainbow that it could not provide the full 20,000 MMBtu of balancing services on one day. In February 2017, Rainbow terminated the MAG-0005 and ceased making payments under it.

Rainbow then sued AMID for breach of contract, repudiation, fraud, fraudulent inducement, and negligent misrepresentation. AMID, in turn, counterclaimed for breach of contract. Rainbow claimed over $6 million in lost profits based on AMID's supposedly unreliable performance under the MAG-0005. During a bench trial, Rainbow representatives testified that Rainbow's business model mostly relied on making "forward trades." Under a forward-trading strategy, Rainbow entered forward sales contracts—promises to sell gas on a future date at a set price. It then entered forward supply contracts—promises to buy gas on a future date at a set price—to fulfill its forward sales contracts. This strategy provided Rainbow with certainty that it could fulfill its obligations to its customers and "guarantee[d] . . . profit going forward."

7

The first year the MAG-0005 was in effect, Rainbow used it solely to make daily trades—withdrawing gas from the Magnolia to sell when prices spiked and then later resupplying the Magnolia when prices fell. Rainbow made daily trades to test whether the MAG-0005 could be a reliable source of gas to fulfill forward sales contracts. After AMID limited Rainbow's nominations in January 2016, Rainbow believed it could not rely on the MAG-0005 to fulfill forward sales contracts. Rainbow representatives testified that had AMID provided "firm" balancing services, Rainbow would have entered into more forward sales contracts and relied on the MAG-0005 as "an insurance policy," providing a "firm" supply of gas that Rainbow could draw on when it needed to fulfill the additional forward sales contracts. But Rainbow did not make additional forward sales because it believed AMID's performance was not reliable. Instead, Rainbow continued to use the MAG-0005 to support daily trades only. Rainbow's damages model computed over $6 million in lost profits due to Rainbow's inability to enter additional forward sales contracts.

The trial court found for Rainbow on all its claims. In its amended findings of fact and conclusions of law, the trial court read Section 9.1 of the MAG-0005 as excusing AMID's performance if:

> Transco either (a) requested or required AMID to balance scheduled quantities with physical deliveries of gas at the Magnolia-Transco Interconnect where Rainbow's use of the MAG-0005 created an imbalance between scheduled quantities and physical deliveries at that point; or (b) requested or required Rainbow or AMID to balance Rainbow's receipts and deliveries on Transco where use of the MAG-0005 would create an imbalance between

8

Rainbow's scheduled receipts and scheduled deliveries on Transco.

Based on this interpretation of Section 9.1, the trial court found that AMID breached the MAG-0005 by refusing to provide balancing services on seven specific days as well as "on a number of" unidentified "occasions between May and August 2016."

The trial court further found that De La Rosa's statements on the conference call—namely, that AMID could not provide 20,000 MMBtu of balancing services for three or more consecutive days, that the MAG-0005 "would thereafter be considered interruptible," and that "AMID needed to limit Rainbow's use of [the] MAG-0005 to stay under Transco's radar"—constituted a repudiation of the MAG-0005. As for Rainbow's tort claims, the trial court found that AMID's "represent[ation] to Rainbow [that] it had the ability to provide a firm balancing service . . . subject only to the express limitations set forth in the MAG-0005" constituted fraud and fraudulent inducement. And it found that "AMID negligently misrepresented to Rainbow that it would provide a firm balancing service up to 20,000 MMBtu/day."

The trial court concluded that "AMID's refusals to provide service constituted a material breach of [the] MAG-0005 and effectively made the firm balancing service interruptible, destroying the benefit of the bargain for Rainbow." AMID's conduct "damaged Rainbow by making it impossible for Rainbow to reliably enter into forward sales with customers—under which Rainbow would have earned profits." The court further concluded that Rainbow's damages model "compute[d] with reasonable certainty" more than $6 million of lost profits. Rainbow elected to recover on its breach-of-contract claim. The court rendered

9

judgment for Rainbow, awarding it over $6 million in lost profits, pre- and post-judgment interest, and costs.

A divided court of appeals affirmed. The majority held that sufficient evidence supported the trial court's finding that AMID breached the MAG-0005. 667 S.W.3d 837, 843 (Tex. App.—Houston [1st Dist.] 2023). It found that the trial court's interpretation of Section 9.1 correctly differentiated between sentence one, which applies to "a point-to-point imbalance or scheduling imbalance—an imbalance between receipts scheduled into the pipeline and deliveries scheduled out of the pipeline," and sentence two, which applies to "a single-point imbalance or operational imbalance—an imbalance between the amount of gas scheduled to move through a point like the [Magnolia–Transco] interconnect and the amount of gas actually measured at that point." *Id.* at 858. "In light of" what the majority considered "the proper construction of the MAG-0005," it concluded that AMID breached by limiting Rainbow's out-of-balance nominations when no OFO or critical alert excused AMID's performance. *Id.* at 860–61. The majority further held that AMID repudiated the MAG-0005 on the December 2016 call when it "expressed that it was no longer able to perform the MAG-0005 as agreed." *Id.* at 863.

The court of appeals also affirmed Rainbow's award of lost profits. *Id.* at 870. The majority concluded that Rainbow's damages model accounted, with reasonable certainty, for "the difference between what it bargained for—a firm balancing contract that it could rely on to enter into forward sales contracts—and what it received—interruptible,

10

unreliable performance that would not support forward sales contracts." *Id.* at 867.

The dissent would have reversed, rendered judgment for AMID in part, and remanded for a new trial on some of the claims. The dissenting justice "conclude[d] that the trial court misconstrued a key provision of the parties' unambiguous MAG-0005 agreement by inserting limiting qualifiers that changed the terms of the parties' bargain." *Id.* at 871 (Farris, J., dissenting). Specifically, "[t]he trial court erred by inserting the word 'scheduled' before deliveries in construing [S]ection 9.1 sentence one." *Id.* at 873. Under the trial court's interpretation, AMID could refuse to provide balancing services only if there was a *scheduled* point-to-point imbalance—"a scenario that does not occur." *Id.* at 873–74. The trial court violated contract-interpretation principles by giving the word "deliveries" different meaning in sentence one and sentence two of Section 9.1, when "[n]othing in the context of the MAG-0005 supports this distinction." *Id.* at 874.

As the dissent explained:

As a matter of law, under [S]ection 9.1, AMID did not breach the MAG-0005 by denying balancing services to Rainbow on any day upon which Transco had issued a written OFO or critical alert requesting or requiring Rainbow to balance receipts and deliveries of gas (including physical deliveries) attributable to Rainbow.

*Id.* at 878. The dissenting justice therefore would have remanded Rainbow's breach-of-contract claim to the trial court "to determine whether an OFO applicable to Rainbow was in place on any day upon which an alleged breach occurred." *Id.* at 879.

11

The dissent would have rendered judgment for AMID on Rainbow's repudiation claim. Under the MAG-0005's proper interpretation, De La Rosa's statements on the December call "reflect AMID's assertion of its rights under [S]ection 9.1 as opposed to a repudiation of the MAG-0005." *Id.* at 880. AMID did not absolutely refuse to perform, nor did Rainbow treat the MAG-0005 as repudiated, insofar as it continued performing for over a month after the call.

Finally, the dissent would have rendered judgment for AMID on Rainbow's tort claims because "[w]hen the MAG-0005 [S]ection 9.1 is properly interpreted, there is no evidence of any falsity in AMID's representation that AMID 'had the ability to provide a firm balancing service . . . subject only to the express limitations set forth in the MAG-0005.'" *Id.* at 883.

We granted AMID's petition for review.

## II

Judges cannot write language into a contract that the parties did not include themselves. That's what the trial court did here, erroneously inserting language into Section 9.1 of the MAG-0005. We hold that, under a proper interpretation of Section 9.1, AMID was excused from providing balancing services on any day that Transco required AMID or Rainbow to limit imbalances attributable to Rainbow. The plain language of the parties' agreement didn't limit the type of imbalance that would excuse AMID's performance, so neither can we.

When interpreting a contract, we first look to the language of the parties' agreement. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019). We "give effect to the parties'

12

intentions, as expressed in their agreement," by giving language "its plain, grammatical meaning." *Id.* Courts may not "rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained." *Tenneco*, 925 S.W.2d at 646. Nor may courts interpret a contract in a way that "disturb[s] the risk allocation to which the parties agreed." *Barrow-Shaver*, 590 S.W.3d at 493.

The trial court failed to heed these commands, impermissibly adding words to Section 9.1 of the MAG-0005. Section 9.1 excused AMID's performance if:

1. "either [AMID] or [Rainbow] is requested or required by [Transco] to balance receipts and deliveries of gas attributable to [Rainbow];" or

2. "[AMID] is requested or required by [Transco] to balance receipts or deliveries of gas that are attributable to [Rainbow]."

The trial court, however, interpreted Section 9.1 as excusing AMID's performance if:

1. Transco "requested or required Rainbow or AMID to balance Rainbow's receipts and deliveries on Transco where use of the MAG-0005 would create an imbalance between Rainbow's *scheduled* receipts and *scheduled* deliveries on Transco;" or

2. Transco "requested or required AMID to balance *scheduled* quantities with *physical* deliveries of gas at the Magnolia-Transco Interconnect where Rainbow's use of the MAG-0005 created an imbalance between *scheduled* quantities and *physical* deliveries at that point."

(Emphases added.) Nowhere in the text of Section 9.1 do the words "scheduled" or "physical" appear. The trial court's addition of these words materially changed the meaning of Section 9.1.

13

Rainbow argues that inserting the words "scheduled" and "physical" accounts for different balancing concerns—point-to-point imbalances and single-point imbalances. The parties do not dispute that Section 9.1's first sentence, which dictates balancing "receipts *and* deliveries" of gas, refers to point-to-point imbalances; and that sentence two, which dictates balancing "receipts *or* deliveries" of gas, refers to single-point imbalances. Given this "and"/"or" dichotomy in Section 9.1, the trial court did not need to insert the words "scheduled" and "physical" to do the work that "and" and "or" were already doing.

Because the parties agree that only sentence one of Section 9.1 is at issue, we focus on it. The majority below justified the trial court's addition of "scheduled" to sentence one by stating that sentence one "necessarily implicates a point-to-point imbalance or scheduling imbalance—an imbalance between receipts scheduled into the pipeline and deliveries scheduled out of the pipeline." 667 S.W.3d at 858. This conflates point-to-point imbalances and scheduled imbalances. Rainbow's use of the MAG-0005 resulted in a point-to-point imbalance, of which there can be two types: scheduled and physical. A *scheduled* point-to-point imbalance occurs when a shipper nominates unequal amounts of gas to enter and exit the pipeline. A *physical* point-to-point imbalance occurs when a shipper withdraws gas from the pipeline without putting a corresponding amount of gas into it (or vice versa).

The trial court interpreted Section 9.1's first sentence to apply only to scheduled imbalances. But Section 9.1 does not distinguish between types of imbalances. The plain language controls our analysis, not "what one side or the other alleges they intended to say but did not."

14

*Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010). Rainbow might have intended to limit AMID's non-performance excuse to only scheduled imbalances, but the text of the agreement—to which it mutually assented—did not. We refuse to restrict Section 9.1 in a way that the parties didn't put down on paper. *See Tenneco*, 925 S.W.2d at 646 (holding that courts must not "imply restraints for which [the parties] have not bargained"). Doing otherwise increases the likelihood of disturbing the risk allocation to which they agreed. *Barrow-Shaver*, 590 S.W.3d at 493.

This case proves the point. As the dissent below noted, "[i]t is undisputed that Rainbow never has an imbalance between its scheduled receipts and scheduled deliveries." 667 S.W.3d at 873 (Farris, J., dissenting). Thus, "the trial court limited AMID's sentence-one exemption to a scenario that does not occur," rendering meaningless an entire sentence of Section 9.1. *Id.* at 874. Such a result should be avoided when interpreting a contract. *See Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 892–93 (Tex. 2017).

We therefore hold that the trial court erred in its interpretation of the MAG-0005. The plain language of Section 9.1 excused AMID from providing balancing services any time Transco required AMID or Rainbow to limit scheduled or physical imbalances attributable to Rainbow.

## III

Three consequences flow from correcting the trial court's interpretation of Section 9.1. First, we reverse and remand for a new trial on Rainbow's and AMID's breach-of-contract claims to determine

whether, on any day that AMID failed to provide balancing services, there was a Transco mandate that excused AMID's performance. Second, we reverse and render judgment for AMID on Rainbow's contract-repudiation claim. Third, we reverse and render judgment for AMID on Rainbow's claims of fraud, fraudulent inducement, and negligent misrepresentation.

## A

The trial court rendered judgment for Rainbow on its breach-of-contract claim, and the court of appeals affirmed. But they did so based on a misreading of Section 9.1. Under Section 9.1, AMID was excused from providing balancing services on any day that Transco required AMID or Rainbow to limit imbalances (including physical imbalances) attributable to Rainbow. It remains to be determined the days on which AMID failed to provide balancing services, and whether a Transco mandate excused AMID's performance on any of those days. We therefore remand for a new trial on Rainbow's breach-of-contract claim.

The trial court found that AMID breached the MAG-0005 on seven specific days as well as a "on a number of [unspecified] occasions," and that no Transco request excused AMID's performance. AMID argues that on all but one of those seven days, Transco had an OFO in place that excused its performance. The parties agree that Transco's OFOs did not require AMID, as a party to an Operational Balancing Agreement, to limit imbalances. But Section 9.1 also excused AMID's performance if Transco requested that Rainbow limit its imbalances,

16

and the parties disagree as to whether Rainbow was subject to any such request.

In each OFO, the box for "[a]ffected [s]hipper(s)" was blank, followed by the notation that "[i]f specific [shippers] have been identified, only imbalances created by those shippers" were subject to the OFO. AMID argues that because the OFO did not identify a specific shipper, it applied to all shippers, including Rainbow. Rainbow responds with evidence of AMID's previous interpretation of the OFOs. When Transco issued an OFO in the Magnolia's region, Rainbow asked AMID whether the OFO impacted its use of the MAG-0005. An AMID representative initially responded that, yes, the OFO "impact[s] the amount of . . . gas we can give." Forty-five minutes later, AMID changed its tune: "The OFO doesn[']t really affect us now as they have not pulled in the [Operational Balancing Agreement] parties yet[,] but if they do[,] then it would be an issue." We do not attempt to reconcile the record ourselves but instead remand to the trial court for new fact-finding under a proper interpretation of the MAG-0005.

The courts below found that AMID's breach of the MAG-0005 excused Rainbow's performance and therefore rendered judgment for Rainbow on AMID's breach-of-contract counterclaim. Having remanded for a determination of whether AMID materially breached the MAG-0005, we also remand for a new trial on AMID's breach-of-contract counterclaim.

## B

The trial court also found that AMID repudiated the MAG-0005 by describing it as "interruptible" on the parties' conference call. Under

17

a correct interpretation of Section 9.1, however, there is legally insufficient evidence of repudiation. AMID did not repudiate the MAG-0005 by communicating its sound reading of that contract to Rainbow.

A party repudiates an agreement when it makes "a distinct and unequivocal absolute refusal to perform" without just excuse. *Kilgore v. Nw. Tex. Baptist Educ. Soc'y*, 37 S.W. 598, 600 (Tex. 1896). The non-repudiating party must "treat[ ] and act[ ] upon" the repudiation as if it were "unconditional in its terms." *Id.* "[A] mere assertion that the party will be unable or will refuse to perform his contract is not sufficient." *Davis v. Canyon Creek Ests. Homeowners Ass'n*, 350 S.W.3d 301, 313 (Tex. App.—San Antonio 2011, pet. denied) (quoting *Kilgore*, 37 S.W. at 600).

Rainbow hangs its hat on AMID-representative De La Rosa's statement that the MAG-0005 "is interruptible, subject to the approval or being under [the] radar with Transco." Rainbow contends that because the MAG-0005 was a "firm" agreement, De La Rosa's description of the MAG-0005 as "interruptible"—which has a technical meaning in the natural-gas industry—repudiated the contract. But the context of the entire call refutes Rainbow's argument. The parties held that call to discuss Transco's stricter stance on limiting imbalances. Rainbow's representative, Moreino, began the call by asking AMID's thoughts about Rainbow's "flexibility on using this balancing agreement" "going forward." De La Rosa advised Rainbow that AMID needed to "keep [its] imbalance under the radar with Transco." If AMID ran an imbalance of 20,000 MMBtu on consecutive days, Transco would

18

"call [AMID] out very quickly" and require it to eliminate its imbalance. Given Transco's new policy, De La Rosa advised Rainbow that AMID would not be able to provide 20,000 MMBtu of balancing services for three straight days.

The entire context of the call shows that AMID did not unequivocally refuse to perform. Rather, AMID expressed a willingness to continue operating under Transco's new policy of limiting imbalances. AMID acknowledged that because Section 9.1 allowed Transco to limit imbalances, the parties needed to adapt their operations to comply with Transco's stricter regulations. AMID's statement that the MAG-0005 was "interruptible"—in that a Transco mandate contractually excused its performance—did not amount to repudiation.

Nor did Rainbow "treat[ ] and act[ ] upon" the alleged repudiation as if it were "unconditional." *Kilgore*, 37 S.W. at 600. Rainbow agreed to "huddle up and try to figure it out" following the call because it loved the flexibility of the MAG-0005. Both parties left the call seeking a mutually profitable way forward and operated as such for more than a month thereafter.

AMID did no more than describe its obligations under the MAG-0005 and work with Rainbow to prevent Transco from limiting the parties' use of the MAG-0005. We hold that the parties' divergence of interpretation as to the MAG-0005 is insufficient to repudiate it. We therefore reverse and render judgment for AMID on Rainbow's contract-repudiation claim.

19

## C

The trial court also found AMID liable for fraud, fraudulent inducement, and negligent misrepresentation. Yet there was no falsity in AMID's representation that it could provide "firm" balancing services, subject to the express limits of Section 9.1.

To recover on its tort claims, Rainbow had to show that AMID made a false representation on which Rainbow justifiably relied. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011); *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653–54 (Tex. 2018). According to the trial court, AMID misrepresented that it could provide daily "firm balancing services" of up to 20,000 MMBtu "subject only to the express limitations set forth in the MAG-0005." When Section 9.1 is properly interpreted, though, AMID's representation was true.

AMID's Operational Balancing Agreement with Transco allowed it to maintain a daily imbalance at the Magnolia–Transco interconnect. Transco could limit AMID's imbalance if it "exceed[ed] 5% of confirmed nominations" and "create[d] operational concerns." Rainbow argues that because 5% of total nominations equals 6,000 MMBtu, AMID's representation that it could maintain an imbalance of 20,000 MMBtu was false. But AMID could maintain an imbalance greater than 6,000 MMBtu if it did not create operational concerns. And as Rainbow knew before entering the MAG-0005, AMID maintained daily imbalances as large as 40,000 MMBtu. Section 9.1, when properly interpreted to apply to physical imbalances, corresponds to Transco's ability to limit imbalances that "create[d] operational concerns." There

20

is no falsity in AMID's representation that it could provide balancing services of 20,000 MMBtu, subject to the express limitation found in Section 9.1 of the MAG-0005.

The trial court also found "AMID negligently misrepresented to Rainbow that it would provide a firm balancing service up to 20,000 MMBtu/day." As the dissent below noted, it is unclear whether the trial court found Rainbow to have made a separate oral promise to this effect. 667 S.W.3d at 884 (Farris, J., dissenting). To the extent any such representation conflicted with the express terms of the MAG-0005, Rainbow could not justifiably rely on it, thus defeating its claim. *See, e.g.*, *JPMorgan*, 546 S.W.3d at 658–60.

Rainbow cannot convert its breach-of-contract claim into various tort claims to make up for its erroneous interpretation of the MAG-0005. AMID's accurate statements about its contractual obligations do not give rise to liability. Because there is no evidence of any misrepresentation, we reverse and render judgment for AMID on Rainbow's claims of fraud, fraudulent inducement, and negligent misrepresentation.

## IV

We briefly offer guidance on the proper measure of lost-profits damages for the lower courts to apply on remand, if necessary. The trial court improperly awarded, and the court of appeals improperly affirmed, speculative lost-profits damages.

Courts may award lost-profits damages only if the claimant proves the fact and amount of damages with reasonable certainty. *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 860

21

(Tex. 2017). A party may not recover "[p]rofits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, . . . or on the success of a new and unproven enterprise." *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994). Rainbow argues that but-for AMID's breach, it would have entered into, and profited from, additional forward sales contracts. Rainbow claims it would have fulfilled the forward sales contracts by buying gas on the daily market and relying on the MAG-0005 as an "insurance policy" when daily gas prices spiked.

But Rainbow cannot recover lost-profits damages for an "untested venture[ ]" like this. *See Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 280 (Tex. 2015). It is undisputed that Rainbow, even before AMID's alleged breach, never used the daily market or the MAG-0005 to fulfill forward sales contracts. Rather, Rainbow solely used the MAG-0005 to make daily trades—withdrawing gas from the Magnolia to sell when prices spiked and then later resupplying when prices fell. Rainbow points us to no evidence that, in its twenty-five-year existence, it has ever engaged in the strategy for which it now seeks to recover. Rainbow cannot recover for the "new and unproven enterprise" of entering a forward sales contract without a corresponding forward supply. *See Tex. Instruments*, 877 S.W.2d at 279, 280 ("The mere hope for success of an untried enterprise, even when that hope is realistic, is not enough for recovery of lost profits.").

Further, using the MAG-0005 to fulfill forward sales contracts is the type of "chancy business opportunit[y]" for which our precedent

forbids recovery. *See id.* at 279. While the MAG-0005 was in effect, the price of gas on the daily market fluctuated from a few dollars to over a hundred dollars per MMBtu. Such "changing market conditions" are too speculative to support lost-profits damages. *Id.* Nor could Rainbow use the MAG-0005 as an "insurance policy" to provide a firm gas supply in case of fluctuations in the daily market. As Section 9.1 contemplates, when Transco limited imbalances, AMID would be excused from providing balancing services. Rainbow would then be unable to use the MAG-0005 to fulfill forward sales contracts—putting it at the mercy of the daily market once again.

Section 9.1's express provision for AMID's non-performance in the event of Transco's interference suggests that Rainbow "gamble[d]" on Transco maintaining its lenient stance on imbalances. *See id.* at 280–81. The parties do not dispute that the lost-profits damages were based on accurate market prices. *See Horizon Health*, 520 S.W.3d at 860 (requiring lost profits to be "based on objective facts, figures, or data from which the amount of lost profits can be ascertained" (quoting *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010))). But lost profits cannot be awarded based on a speculative strategy, as the trial court did here. "In the memorable words of Don Meredith, the reputed origin of this aphorism, 'If ifs and buts were candy and nuts, we'd all have a Merry Christmas.'" *Phillips*, 475 S.W.3d at 280 n.40.

\*　　　\*　　　\*

The trial court was wrong to blue-pencil the words "physical" and "scheduled" into the parties' agreement. These two words created a cascade of errors that we now correct. The plain language of Section 9.1

23

excused AMID from providing balancing services on any day Transco instructed AMID or Rainbow to limit imbalances (of whatever type) attributable to Rainbow.  We reverse, render judgment for AMID on Rainbow's contract-repudiation and tort claims, and remand for a new trial on Rainbow's and AMID's breach-of-contract claims.

James P. Sullivan
Justice

**OPINION DELIVERED:** May 23, 2025